Gary D. McQUILLAN and America's Truckaway Systems, Inc.
*v.* MERCEDES-BENZ CREDIT CORPORATION

97-209 961 S.W.2d 729

Supreme Court of Arkansas
Opinion delivered January 29, 1998

244

*Zurborg & Spaulding, P.A.,* by: *Brian L. Spaulding,* for appellants.

*Burke & Eldridge, P.A.*, by: *John R. Eldridge, III*, for appellee.

DONALD L. CORBIN, Justice. Appellants Gary D. McQuillan and America's Truckaway Systems, Inc., (ATS) appeal the judgment of the Carroll County Circuit Court, Western District, awarding damages in the amount of $17,509.52 and $1,000.00 in attorney's fees to Appellee Mercedes-Benz Credit Corporation (MBCC) for its claims of replevin and conversion against Appellants. On appeal, Appellants assert that the trial court erred in finding that a conversion had occurred and in calculating the damages and fees awarded to MBCC. This case is certified to us from the court of appeals, as the issues present questions involving the law of torts; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(d). We affirm.

The matter was tried before the court in a bench trial. The judgment reflects that the trial court made the following findings of fact. MBCC had a perfected security interest in two 1991 Freightliner trucks arising from a retail installment contract in which MBCC had financed the purchase of the trucks by Penguin Truck Leasing, Inc., from New Dallas Freightliner. The parties stipulated as to the existence of MBCC's perfected security interest. Penguin subsequently defaulted on its payments under the agreement.

In late 1993, ATS hauled seventeen trucks for St. Lawrence Freightway from Dallas, Texas, to various locations. Two of those seventeen trucks were the same trucks in which MBCC had a perfected security interest. ATS issued three invoices, one dated November 22, 1993, and two dated December 9, 1993, to St. Lawrence Freightway for transporting fourteen of the seventeen vehicles, including the two MBCC trucks. Those two trucks were transported by ATS under separate invoice dated December 9, 1993, from Dallas to McKee's Rock, Pennsylvania. All three of the invoices issued from ATS to St. Lawrence Freightway were unpaid.[1] The record reflects that the first invoice, number 3296, was for transporting six trucks, with a total amount of $4,123.50

---

[1] It is not known what the exact relationship was between St. Lawrence Freightway and Penguin Truck Leasing, Inc.

payable to ATS. The second invoice, number 3305, was also for transporting six trucks, with a total amount of $3,712.94 payable to ATS. The third invoice, number 3310, was for transporting the two MBCC trucks, with an amount of $1,682.80 payable to ATS.

The court found further that when the two MBCC trucks were delivered at McKee's Rock, on December 7, 1993, the driver demanded payment for all three invoices issued by ATS, but did not receive any payment. ATS then stored the two MBCC trucks at Cerni Truck Center in Hubbard, Ohio. No later than May 27, 1994, and subsequent to Penguin's default under the installment agreement with MBCC, McQuillan, individually and as president of ATS, received notice that MBCC had a perfected security interest in the two trucks. On or about June 15, 1994, McQuillan was served with process issued out of Cass County, Missouri, in an action commenced by MBCC for possession of the two trucks that were being stored, unbeknownst to MBCC, at Cerni Truck Center in Ohio. McQuillan hired an attorney to defend against the action filed in Missouri, who made an offer to MBCC in which Appellants would return the two trucks if MBCC would pay all of the unpaid invoices, together with the unpaid storage charges for the trucks. In other words, Appellants were attempting to secure payment from MBCC for the entire debt owed by St. Lawrence Freightway to ATS for transporting the fourteen trucks, notwithstanding the fact that MBCC only had an interest in two of those trucks.

MBCC filed the instant action for replevin in Carroll County on July 14, 1994. Alternatively, MBCC prayed for relief under a theory of conversion. Through his attorney in the Arkansas action, McQuillan offered to return the two trucks to MBCC for the sum of $8,000.00, if MBCC agreed to pay the storage charges. The invoice pertaining to the two MBCC trucks was for the sum of $1,682.80. MBCC discovered the location of the two trucks in October 1994, and obtained possession of them on October 6, 1994, after paying Cerni Truck Center the sum of $4,000.00 in storage fees. In addition to the storage fees, MBCC also paid $400.00 for the transportation of the two trucks and expended $13,109.52 in legal fees in its attempts to recover the trucks through the legal processes of various states.

The trial court specifically rejected Appellants' claim that ATS had a carrier's lien on the two trucks. Instead, the court found that Appellants' actions in refusing to surrender possession of the two trucks to MBCC, in placing them in "secret storage," and insisting upon payment of charges over and above those to which they would have been entitled under a properly established carrier's lien, constituted the tort of conversion.

## I. Conversion

For their first point for reversal, Appellants argue that the trial court erred in finding that a conversion had occurred, as they contend that they had a valid carrier's lien on the two trucks that was superior to MBCC's perfected security interest. We disagree.

■ ■ Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *France v. Nelson*, 292 Ark. 219, 729 S.W.2d 161 (1987); *Gardner v. Robinson*, 42 Ark. App. 90, 854 S.W.2d 356 (1993). To establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owners' rights. *South v. Smith*, 326 Ark. 774, 934 S.W.2d 503 (1996) (citing *Dent v. Wright*, 322 Ark. 256, 909 S.W.2d 302 (1995)); *Reed v. Hamilton*, 315 Ark. 56, 864 S.W.2d 845 (1993). Where the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for defendant's own use or another's use. *Id.*

■ ■ In *Car Transp. v. Garden Spot Distrib.*, 305 Ark. 82, 805 S.W.2d 632 (1991), relied upon by MBCC, this court observed that conscious wrongdoing is not the requisite intent for conversion; rather, what is required is that there be intent to exercise control or dominion over the goods. In that case, the appellant was attempting to assert a carrier's lien and was demanding payment of current charges as well as past debts before it would deliver the goods to the owner. This court held that "[i]f a lien defense is available to the motor carrier, it can only be asserted against currently transported goods for current freight charges that remain unpaid." *Id.* at 87, 805 S.W.2d at 634. This court held further that its conclusion was supported by Prosser:

An unqualified refusal to surrender, stating no reason, or one stating the wrong reason, is still a conversion, even where there are unstated justifications. *And if the defendant insists upon charges, or other conditions of delivery, which he has no right to impose, there is conversion.*

*Id.* (emphasis added) (quoting *Prosser and Keaton on Torts*, § 15, at 100 (5th ed. 1984)).

Arkansas Code Annotated § 4-7-307 (Repl. 1991) provides for the establishment of a carrier's lien:

(1) A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law. But against a purchaser for value of a negotiable bill of lading a carrier's lien is limited to charges stated in the bill or the applicable tariffs, or if no charges are stated then to a reasonable charge.

(2) A lien for charges and expenses under subsection (1) on goods which the carrier was required by law to receive for transportation is effective against the consignor or any person entitled to the goods unless the carrier had notice that the consignor lacked authority to subject the goods to such charges and expenses. Any other lien under subsection (1) is effective against the consignor and any person who permitted the bailor to have control or possession of the goods unless the carrier had notice that the bailor lacked such authority.

(3) *A carrier loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.* [Emphasis added.]

McQuillan testified below that he had instructed his contracted driver not to release the two MBCC trucks until he had received payment for all of the invoices. In response to MBCC's attorney's question whether he, through his Missouri attorney, had offered to return the trucks if MBCC would pay all the invoices plus storage fees, McQuillan stated "[w]e was [sic] trying to get all our money." Additionally, McQuillan admitted that he had never extended an offer to return the trucks to MBCC in exchange for the transportation fees for the two trucks, $1,682.80, plus storage fees. In addition to such testimony, the trial court

also received into evidence various letters between the attorneys for the parties in which offers for the trucks' release were discussed. One such letter, dated September 19, 1994, from McQuillan's then attorney to MBCC's attorney indicated that McQuillan would be pleased to inform MBCC of the storage location of the trucks upon receipt of $7,000.00, which MBCC had previously offered as a complete settlement of the transportation fees and storage costs.

The trial court specifically found that Appellants had not established that they had acquired a valid carrier's lien because they had refused to surrender possession of the two trucks to MBCC, had placed the trucks in "secret storage," and had insisted upon payment of charges over and above those to which they would have been entitled, by demanding payment of all three invoices, despite the fact that only one of the invoices pertained to the transportation fees for the two trucks at issue.

■ ■ In bench trials, the standard of review on appeal is whether the trial judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *Schueck v. Burris*, 330 Ark. 780, 957 S.W.2d 702 (1997); ARCP Rule 52(a). We view the evidence in a light most favorable to the appellee, resolving all inferences in favor of the appellee. *France*, 292 Ark. 219, 729 S.W.2d 161. Disputed facts and determinations of the credibility of witnesses are within the province of the factfinder. *Id.* Based upon the evidence presented below and the testimony of McQuillan, we cannot say that the trial court's findings on this issue were clearly erroneous.

## II. Damages

For their second point for reversal, Appellants argue that the trial court erred in its award and assessment of damages to MBCC. Specifically, they contend that there was an absence of proof as to the market value of the two trucks, and that the trial court erred in awarding attorney's fees, as they contend there is no authority for awarding such fees in a conversion case.

MBCC contends that it was entitled to compensatory damages caused by Appellants' wrongful refusal to surrender the trucks, and that it was due to such wrongful refusal that MBCC

incurred attorney's fees in the amount of $13,109.52. MBCC contends further that the testimony of Andrew Kanel established that MBCC had paid $4,000.00 in storage charges, $400.00 for hauling the trucks from Cerni Truck Center, and $13,109.52 for attorney's fees incurred in the attempt to recover possession of the trucks. MBCC asserts that the attorney's fees claimed were only those incurred as a direct result of its attempts to secure possession of the trucks, and that no such fees were claimed subsequent to the time that possession of the trucks was obtained.

■ ■ Ordinarily, the proper measure of damages for conversion of property is the market value of the property at the time and place of its conversion. *Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991); *Ford Motor Credit Co. v. Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979). The market value of the property is not, however, the only measure of the damages recoverable in an action for conversion; the circumstances of the case may require a different standard, including a measure of the expenses incurred as a result of the conversion. *First Nat'l Bank of Brinkley, Ark. v. Frey*, 282 Ark. 339, 668 S.W.2d 533 (1984). Moreover, the fact that the items were eventually returned to the owners does not necessarily bar recovery of damages for their conversion, but may mitigate the damages. *Ford Motor Credit Co.*, 267 Ark. 201, 589 S.W.2d 584. Generally, the law permits evidence of the return of the property to its owner in mitigation of damages only when certain circumstances are present: (1) that the owner must have accepted the return of the goods; (2) that the original conversion occurred by mistake; and (3) that the return of the goods occurred promptly after the discovery of the mistake and before the commencement of the action for conversion. *McKenzie v. Tom Gibson Ford, Inc.*, 295 Ark. 326, 749 S.W.2d 653 (1988).

■ In the case at hand, MBCC did eventually receive possession of the converted property. The trial court then awarded damages to MBCC in the amount of $17,509.52, the exact amount of the costs that Kanel stated were expended by MBCC in its attempts to recover possession of the two trucks. As such, we cannot say that the trial court erred in awarding such compensatory damages, as this court has acknowledged the permissibility of awarding damages in an action for conversion based upon the

expenses incurred as a result of the conversion. *First Nat'l Bank of Brinkley*, 282 Ark. 339, 668 S.W.2d 533.

Furthermore, we cannot say that the award of damages for legal fees incurred by MBCC in its attempts to recover the two trucks was erroneous. This conclusion is supported by the decisions of other jurisdictions. In *Fulks v. Fulks*, 121 N.E.2d 180 (Ohio Ct. App. 1953), the Ohio Court of Appeals held that although attorney's fees incurred in the prosecution of a conversion action were not recoverable, those attorney's fees spent in recovering possession of the converted property were properly awarded as special damages by the trial court. Subsequently, that same court explained the decision in *Fulks*, holding that there was a distinction between those attorney's fees expended in an effort to recover the converted property and those expended generally in the prosecution of the conversion action. *Cincinnati Ins. Co. v. Diebold, Inc.*, 581 N.E.2d 566 (Ohio Ct. App. 1989). That court went on to hold that where the action is one to recover money damages for the wrongful conversion of the property, as opposed to an action to recover the *possession* of the property, attorney's fees are not proper damages. *Id.* Similarly, the Texas Court of Civil Appeals has held that the measure of damages for the conversion of personal property may include special damages "resulting from the withholding of the property or properly incurred by the owner in the pursuit of it." *Reed v. White, Weld & Co., Inc.*, 571 S.W.2d 395, 397 (Tex. Civ. App. 1978). We find these holdings persuasive of the issue involved in this case.

 Here, the action was one for replevin and, alternatively, for conversion of the two trucks. As such, the expenses incurred by MBCC in its attempts to recover possession of the trucks are proper as damages under the circumstances of this case. We see no reason to distinguish the award of such expenses based upon whether the actions taken to secure the return of the property were performed by attorneys or persons of other occupations, such as repossession agents. Additionally, the award of such damages is supported by Ark. Code Ann. § 18-60-820(a) (1987), which provides that "[i]n an action to recover the possession of personal property, judgment for the plaintiff may be for the delivery of the property, . . . and *damages for the detention*." (Emphasis

added.) *See also France*, 292 Ark. 219, 729 S.W.2d 161. We thus affirm as to that portion of the damages awarded to MBCC.

As for the issue of the separate award of $1,000.00 attorney's fees, we must reverse the trial court's ruling, as it is apparent that this amount was awarded for the expenses incurred in the prosecution of MBCC's suit. The judgment entered below reflects that MBCC was awarded $17,509.52 as costs expended and an additional award of $1,000.00 in attorney's fees. As such, the separate award of $1,000.00 cannot stand. The general rule in Arkansas is that attorney's fees incurred in the pursuit of civil actions are not awarded unless expressly provided for by statute or rule. *Security Pac. Housing Servs., Inc. v. Friddle*, 315 Ark. 178, 866 S.W.2d 375 (1993); *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). Arkansas Code Annotated § 16-22-308 (Repl. 1994), which provides for attorney's fees in specific civil actions, does not allow attorney's fees in tort actions. *Friddle*, 315 Ark. 178, 866 S.W.2d 375; *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992).

Here, the trial court awarded $1,000.00 to MBCC separately as attorney's fees for action taken in pursuit of the civil claims, rather than as part of the costs incurred by MBCC in the recovery of the trucks. Thus, the trial court erred in awarding that sum to MBCC, as attorney's fees incurred generally in the prosecution of replevin and conversion actions are not expressly provided for by statute. Accordingly, we affirm the trial court's award of damages in the amount of $17,509.52, but we modify the judgment to reflect that Appellants are not required to pay the $1,000.00 in attorney's fees resulting from the prosecution of the current litigation.

Affirmed as modified.