2013 Ark.App. 388
## ESSENTIAL ACCOUNTING SYSTEMS, INC.,
Appellant

v.

## DeWayne P. DEWBERRY, Appellee.

### No. CV–12–915.

Court of Appeals of Arkansas.

June 19, 2013.

---

The Farrar Firm, Hot Springs National Park, by: Bryan J. Reis and Philip B. Montgomery, for appellant.

Eichenbaum Liles, P.A., by: Richard F. Ramsay and Alicia Austin Smith, for appellee.

BILL H. WALMSLEY, Judge.

Appellant Essential Accounting Systems, Inc. (EAS), appeals from the trial court's order granting a permanent injunction to appellee DeWayne Dewberry upon finding that the parties' contract transferring Dewberry's property to the corporation was unenforceable. On appeal, EAS argues that the parties had a valid contract, that the property at issue belonged to EAS, and that EAS should have been granted a permanent injunction. We reverse and remand.

In 2008, Maria Lammers and Roger Harrod, both accountants, decided to form a corporation with Dewberry, a software engineer. The purpose of the collaboration initially was to develop accounting and billing software for use in Lammers's and Harrod's accounting practices. The goal eventually evolved into creating a "server solution," which they could market and sell. Articles of incorporation for EAS were first signed on December 15, 2008. On January 23, 2009, restated articles of incorporation were signed along with a stock purchase agreement. "Schedule A" of the stock purchase agreement provided that Lammers, Harrod, and Dewberry each owned 2000 shares of stock. On this date, all three also signed an employment agreement with an incorporated "trade secrets, confidential information, and non-competition agreement." The blank for the amount of compensation remained unfilled on all three employment agreements.

According to Lammers, the three individuals agreed before signing the documents that they would not debt finance their venture. Instead, she and Harrod agreed to front the money for equipment, software, and other expenses. Lammers said that they all agreed that they would divide the profits equally when the product was eventually sold and the corporation earned revenue. She said that the exact amount and timing of compensation would have been worked out in the future; the corporation never had an income. Lammers acknowledged that the written agreements did not provide for the division of profits or require any party to make purchases for the corporation.

STAESYS was software developed by Dewberry in 1998 that they decided to use in the corporation. It was transferred to the corporation in paragraph four of Dewberry's employment agreement, which provides as follows:

4. *Additional compensation.* Employee DeWayne Dewberry has previously developed certain computer software and programs that he has termed and named "Staesys." In consideration of this Employee Agreement and other Agreements, including the right to acquire certain stock issued by the Employer, Employee does hereby assign, transfer, and give to Employer all of his right, title, and interest in any of the software and development thereof of the "Staesys" program and any developments related thereto and covenants and agrees that upon Employer's request [to] sign, execute, and deliver to Employer any documents requested by Employer related to the transfer of ownership of the "Staesys" program or programs or matters related thereto so that any matters related to it shall solely belong to and be the separate property of Employer.

Lammers said that for two and a half years, the corporation further developed STAESYS and added other technologies to it. Lammers said that she and Harrod contributed to the development of STAESYS through buying equipment and software, paying for travel and other expenses, developing a business plan, researching grants, marketing the product, and integrating accounting knowledge and procedures into the computer systems. Lammers also allowed Dewberry to work out of a private suite in her office. Lammers prepared a document titled "Preliminary List of Capitalization Costs," which listed corporation expenses she and Harrod had paid for through May 1, 2011. She said that she would not have made these purchases, including equipment requested by Dewberry, if STAESYS was not the property of EAS. When the product was ready to be marketed, Dewberry prepared brochures and videos, and they together made presentations to multiple organizations. The brochure Dewberry made states that STAESYS had been "transferred to the Essential Accounting Systems, Inc. at its inception."

In June 2011, Dewberry went to the office at night and removed software, hard drives, manuals, and schematics. He also removed the contents of the corporation's safe-deposit box, closed the corporation's bank account, and filed articles to dissolve EAS with no notice to Lammers and Harrod. Upon discovering this, Lammers and Harrod had the dissolution revoked.

Dewberry testified that the items he took were his personal property. He testified that he always believed that he owned STAESYS because an agreement was never reached for his salary and how they were going to do business under the contract. He said that he kept working because Lammers and Harrod made him think they would be getting income from

loans or grants. Dewberry claimed that he took the software because Harrod was ready to enter into a contract but the product was not ready. Harrod testified that Dewberry had participated in presentations representing that the product was a finished product to multiple organizations and had not told him that the product was not ready for market.

On June 20, 2011, EAS filed suit against Dewberry alleging that he had absconded with corporate property. EAS sought a preliminary injunction ordering Dewberry to immediately return all of the property and preventing him from selling, copying, or altering the computer-related applications, software, and hardware. EAS also pled claims of civil conspiracy, theft of trade secrets, breach of fiduciary duty, conversion, and breach of contract. Dewberry filed an answer and counterclaimed for breach of contract, theft of trade secrets, and conversion. The trial court granted EAS's motion for a temporary injunction and ordered the surrender of specified property to the custody of the court.

Prior to the final hearing, an agreed order was entered severing the claims for injunctive relief from the other causes of action. The issues of ownership of the property and injunctive relief would be decided first in a separate trial. The final hearing was held on May 3, 2012.

The trial court issued a letter opinion and order finding that the employment agreement was unenforceable due to "the total lack of consideration and mutuality." The court found that the employment agreements imposed no real obligations upon EAS, Lammers, or Harrod. The court found that the only consideration provided to Dewberry was a one-third share of any profits, which he obtained through his stock ownership, not through the employment agreement. The court stated that Dewberry had effectively given away two-thirds ownership of his software and received nothing in return. Thus, the court concluded that the STAESYS software and other property belonged to Dewberry and granted his request for a permanent injunction. The trial court denied EAS's request for a permanent injunction and dismissed its breach of contract claim.

EAS subsequently filed a motion for new trial or reconsideration on August 2, 2012. It was deemed denied after thirty days. On September 24, 2012, the trial court entered a corrected order with an expanded Rule 54(b) certificate. EAS filed a timely notice of appeal.

 The standard of review for bench trials is whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Housley v. Hensley*, 100 Ark.App. 118, 265 S.W.3d 136 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* Further, when there is testimony in conflict on the issue of whether the parties agreed to the terms of a contract, a factual question arises that is to be determined by the trial court. *Bowen v. Gardner*, 2013 Ark. App. 52, 425 S.W.3d 875. However, a trial court's conclusion on a question of law is reviewed de novo and is given no deference on appeal. *Id.*

 In order for a contract to exist, there must be: (a) competent parties, (b) subject matter, (c) legal consideration, (d) mutual agreement, and (e) mutual obligations. *Kearney v. Shelter Ins. Co.*, 71 Ark.App. 302, 29 S.W.3d 747 (2000). Consideration is any benefit conferred or agreed to be conferred upon the promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suf-

fered by promisor, other than that which he is lawfully bound to suffer. *Id.* Mutual promises constitute consideration, each for the other. *Id.* While mutual promises will sustain a contract, there is no valid agreement if there is no promise by one party as a consideration for the other's promise. *Id.*

EAS argues that the consideration for Dewberry's agreement was his ownership interest in the corporation, which the corporation was obligated to provide and did so provide. EAS argues that the shareholders willingly deferred salary until the venture became profitable. Thus, EAS claims that the blank compensation line in the employment agreements does not evidence lack of consideration because the parties did not intend to receive a salary at that time. EAS contends that through its shareholders and officers it also supplied equipment, the costs of development, accounting knowledge, marketing research, and other forms of consideration. EAS argues that Dewberry needed the resources of EAS to complete the software.

Dewberry argues that under the terms of the employment agreement, he was entitled to compensation and the right to acquire stock. He claims that because the agreement did not provide the amount or timing of compensation or any terms related to any right to acquire certain stock, including the amount, price, or timing, there was no consideration in the contract. Dewberry argues that the employment agreement did not rise to the level of a contract, but instead served as evidence of the parties' intent to work together and come to a formal agreement in the future.

■ The concept of "mutual obligations" has been explained by our supreme court as follows:

> A contract to be enforceable must impose mutual obligations on both of the parties thereto. The contract is based

upon the mutual promises made by the parties; and if the promise made by either does not by its terms fix a real liability upon one party, then such promise does not form a consideration for the promise of the other party. " . . . [M]utuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." A contract, therefore, which leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other.

*Odom Antennas, Inc. v. Stevens,* 61 Ark. App. 182, 186–87, 966 S.W.2d 279, 281 (1998) (citing *Townsend v. Standard Indus., Inc.,* 235 Ark. 951, 954, 363 S.W.2d 535, 537 (1962)). Our supreme court has also said that mutuality of obligation becomes a nonissue when consideration has otherwise been conferred upon one of the parties. *Jordan v. Diamond Equip. & Supply Co.,* 362 Ark. 142, 207 S.W.3d 525 (2005). A promise in exchange for performance does not require mutuality of obligation. *Id.*

EAS argues that there is no lack of mutuality because it performed under the contract by providing Dewberry with one-third ownership in the corporation. EAS contends that Dewberry accepted the benefits of the contractual relationship and performed under the contract for years without raising any claim to the properly at issue. Dewberry argues that EAS did not have any obligations to him under the employment agreement.

We conclude that Dewberry's 2000 shares of stock supplied the necessary consideration to form a valid contract. The employment agreement provides for the

assignment of STAESYS "in consideration of this Employee Agreement and other Agreements, including the right to acquire certain stock issued by the Employer." Executed on the same day as the employment agreement was the stock purchase agreement giving Dewberry 2000 shares. Thus, the corporation promised Dewberry an ownership interest in consideration of the assignment of STAESYS. By virtue of being a stockholder, Dewberry would have the right to future profits. The requirement of mutuality of obligation became a nonissue because there was a promise in exchange for performance. Dewberry promised to transfer STAESYS, and EAS performed by issuing stock to Dewberry.

We hold that the trial court's finding that the contract was unenforceable is clearly erroneous. Because we reverse and remand on this ground, it is not necessary to address EAS's alternative argument that it should prevail on a detrimental-reliance claim. We reverse the grant of Dewberry's request for a permanent injunction, reverse the denial of EAS's request for a permanent injunction, and reverse the dismissal of EAS's breach of contract claim. We remand for further proceedings consistent with this opinion.

Reversed and remanded.

WHITEAKER and WOOD, JJ., agree.